J-A21043-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
BRIAN C. SCARY :
:
Appellant : No. 138 EDA 2021

Appeal from the Judgment of Sentence Entered June 8, 2020
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0000543-2019

BEFORE: KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED SEPTEMBER 15, 2021**

Appellant, Brian C. Scary, appeals from the judgment of sentence

entered in the Court of Common Pleas of Bucks County following Appellant's

conviction by a jury on one count of criminal trespass, one count of recklessly

endangering another person, and two counts of criminal mischief-damage to

property.[1] On appeal, Appellant challenges the discretionary aspects of his

sentence. After a careful review, we affirm.

The relevant facts and procedural history are as follows: On November

21, 2018, the trial court entered a temporary protection from abuse ("PFA")

order against Appellant, which precluded him from entering the home of

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3503, 2705, and 3304, respectively.

Jeanette McLaughlin without her permission. On December 9, 2018, Ms. McLaughlin, as well as her two minor children, were in the home when Appellant broke the side garage door and attempted to kick down the inside garage door to enter the kitchen. After his attempt to enter the home was unsuccessful, Appellant slashed the tires of Ms. McLaughlin's vehicle. Ms. McLaughlin called 911, identified Appellant as the perpetrator, and reported Appellant's activities.

Shortly after the 911 call, the police apprehended Appellant on the street where Ms. McLaughlin resides. The police transported Appellant to the police station, where Appellant became combative and suggested the police officers should fight him. He also made inappropriate comments regarding the police officers' wives and girlfriends, and, after being placed in a cell, Appellant attempted to clog a toilet in order to cause it to overflow.

Appellant, who was represented by counsel, proceeded to a jury trial, at the conclusion of which he was convicted of the offenses indicated *supra*. On June 8, 2020, Appellant proceeded to a sentencing hearing, at which the trial court was provided with the relevant sentencing guidelines and a pretrial domestic violence investigation report ("investigation report").[2] N.T., 6/8/20,

_____

[2] The investigation report was admitted as an exhibit at the sentencing hearing and included in the certified record to this Court. The fifteen-page document contains detailed information regarding Appellant's prior juvenile adjudications of delinquency and adult crimes. Moreover, it contains information regarding the following: Appellant's supervision with the Bucks
*(Footnote Continued Next Page)*

at 3-4. The trial court acknowledged reviewing these documents, as well as the docket sheets, criminal complaint, and probable cause affidavits. *Id.* at 9. The trial court specifically indicated it had "substantial familiarity with the case having presided over [the jury trial]." *Id.* at 14.

The Commonwealth provided the trial court with the outline of Appellant's prior record. Specifically, the Commonwealth indicated Appellant had numerous juvenile adjudications of delinquency. *Id.* at 15. Namely, in 1995, Appellant was adjudicated delinquent of unauthorized use, and in 1996, he was adjudicated delinquent of simple assault, robbery, and theft. *Id.* Moreover, after he turned eighteen years old, Appellant was convicted in 1997 of burglary, in 1998 of possession, in 2000 of theft, in 2002 of criminal trespass, in 2003 of possession, in 2010 of receiving stolen property, in 2010 of burglary, and in 2016 of simple assault. *Id.* at 15-17.

Ms. McLaughlin offered a victim impact statement during the sentencing hearing. Specifically, she indicated:

> I've been considered a victim in the case against my fiancé, [Appellant]. I've been advised that I am able to give a statement before sentencing.
>
> First, please let me say, that I do not and have not ever considered myself a victim of my fiancé, [Appellant]. I don't know

---

County Adult Probation and Parole Office; his misconduct while he was incarcerated; the circumstances underlying the PFA order with regard to Ms. McLaughlin; excerpts from phone calls Appellant made to Ms. McLaughlin while he was incarcerated awaiting trial on the instant matter; Appellant's mental health issues; Appellant's employment history; Appellant's age; and Appellant's lack of social media accounts.

if they should have called it a victim impact statement or a character reference, so I'm just going to speak from my heart.

Throughout most of the case I have felt extremely misunderstood—

\*\*\*

[Appellant] is my best friend and, most importantly, he has always been my biggest supporter. For the last seven years we have built a beautiful life together. He is a smart man and is extremely hard working. He is someone I would always want in my corner.

I have seen him struggle with depression and put his best foot forward and get himself into therapy. He has absolutely thrived. I saw such changes in him. He is such a determined person, yet [Appellant] also has his demons, which he has accepted and he's acknowledged and he's taken responsibility and accountability for. We have discussed and set forth a plan moving forward for him to continue in therapy and for us to have more open communication with each other.

The past 18 months that [Appellant] has been incarcerated have been the worst months of my life. This is the longest we've ever been apart. I have been unable to visit with him since September 2019 due to a no contact order that was put in place, and I haven't even been able to give him a hug since December of 2018. Our hugs have always been the best part of our day.

[Appellant] being gone has had a huge negative impact on my life, my kids' lives, and our family's lives. I have had to leave a well-paying job, I have been unable to pay for our vehicles, and unfortunately, I'm still struggling to get caught up on rent. All of our credit card bills are now in collections which makes purchasing things needed more difficult if I don't have the actual money to do so. My eight-year-old son, who [Appellant] has helped me raise, is struggling with his emotions with how to handle missing his "Bri-Bri." [Appellant's] only daughter graduates high school in June. My mental health due to stress and depression of our lives being turned upside down these 18 months has been overwhelming. [Appellant] is what keeps us stable, both mentally and financially.

Secondly, it saddens me to say that [Appellant's] father has been battling cancer for the past two years. The second—the second—hang on.

\*\*\*

This most recent time is worse than it was before. We're unsure what the future holds for him at this point. [Appellant] has always been his father's right-hand man both personally and in business. His father could really use his help as he is one of the only children still living nearby.

Your Honor, please take into consideration what I've expressed during sentencing. [Appellant] is very much needed at home. I truly believe with all my heart the time we have spent away from each other has taught us both a lot. Any leniency you're able or willing to provide would be greatly appreciated. We all just want our lives back to normal, and I need my family back together.

*Id.* at 18-22.

Thereafter, the trial court permitted the following relevant exchange between Appellant and defense counsel:

**[Defense Counsel]:** Okay. You are 42 years old, is that correct?

**[Appellant]:** Yes, that's correct.

**[Defense Counsel]:** [Appellant], when you're released from custody, where will you live?

**[Appellant]:** ** Valentine Lane.

**[Defense Counsel]:** And with whom will you live?

**[Appellant]:** My parents.

**[Defense Counsel]:** And you work for the family business, is that correct?

**[Appellant]:** Correct, for about 15 years.

**[Defense Counsel]:** And what is the family business?

**[Appellant]:** Well, I work for the corporation, but it's multiple restaurants and—business so I'm actually—

***

**[Defense Counsel]:** And, [Appellant], it's your intention to return to that family business working in some capacity. Is that correct?

**[Appellant]:** Yes, it is.

**[Defense Counsel]:** Okay. And you have your GED, is that correct?

**[Appellant]:** Correct.

**[Defense Counsel]:** You went to the tenth grade.

**[Appellant]:** Yes.

**[Defense Counsel]:** All right. And you've been in custody at the Bucks County Correctional Facility since December 9th of 2018, is that correct?

**[Appellant]:** Yes, that is correct.

**[Defense Counsel]:** And part of that time you've spent in lockdown because of the COVID 19 issue, is that correct?

**[Appellant]:** Yeah, for about the last 80 days.

**[Defense Counsel]:** Okay. And you have—you have stayed healthy, is that correct?

**[Appellant]:** Yes, I have.

**[Defense Counsel]:** Okay. And before you went into this lockdown you did avail yourself of the various treatment classes and things that were available at the correctional facility, is that correct?

**[Appellant]:** Yes, I did a few of them. Yeah.

**[Defense Counsel]:** Okay. You've completed anger management?

**[Appellant]:** Correct.

**[Defense Counsel]:** And you also completed reintegration classes, is that correct?

**[Appellant]:** Yes.

**[Defense Counsel]:** And you've also been visiting with correctional mental health, is that correct?

**[Appellant]:** Yes. They—they see me sometimes twice a week just to touch base with me, especially since everything going on with COVID 19, to make sure, you know, my meds are—you know, everything is built on my medicine basically.

**[Defense Counsel]:** Okay. And they recommended medications for both depression and bipolar disorder, is that correct?

**[Appellant]:** Yeah, I'm actually on them. I've been on them since probably a month after I came in here.

**[Defense Counsel]:** Okay. And you've been compliant with those medications?

**[Appellant]:** Yes, I have.

**[Defense Counsel]:** And you told me that they make you feel better.

**[Appellant]:** Much better, yeah. All the women in mental health, they—you know, the one woman, especially Sara, she said it's like night and day from when I first came in here.

**[Defense Counsel]:** Okay. Now, [Appellant], it's your hope to continue a relationship with Ms. McLaughlin, is that correct?

**[Appellant]:** Yes.

**[Defense Counsel]:** And you've heard her say that you feel— that she feels that you both need counseling.

**[Appellant]:** Ha, yes, definitely.

**[Defense Counsel]:** And you—you and I have discussed that, and you agree that is—that has to be the first stop in continuing a relationship with her.

**[Appellant]:** Oh, yeah, absolutely.

**[Defense Counsel]:** Now, [Appellant], you have the right—you and I discussed this, what is called "allocution," where you have the opportunity to say anything you wish to the Court. Is there anything that you wish—

**[Appellant]:** Yes.

*Id.* at 24-29.

Appellant then made the following statement to the trial court:

So, you know, I'm not going to give you a bunch of excuses. I was always told excuses are simply tools for the, you know, incompetent. I don't find myself to be incompetent at all, Your Honor.

I do, however, find myself to be flawed in many ways. The things I said to them cops, that's not—I'm so glad my family wasn't in that courtroom because it's a disgrace. I was angry at what was going on with myself.

Actually, I just—I don't mean any of those things I said. It was—it's totally embarrassing, and for that I apologize to Officer

- 7 -

Tom Lundquist, to Officer Jeffrey Omlor, to Officer Chris Iacono, as well as Corporal Crozier. The things I said were way, way out of line. They should never have been said.

But, once again, Your Honor, I'm not going to make a bunch of excuses. Wrong is wrong and I was dead wrong. For that I apologize. And hopefully one day the police officers will find it in their hearts to forgive me.

That's all I have, Your Honor.

*Id.* at 29-30.

The following relevant exchange then occurred between the trial court

and Appellant:

**The Court:** [Appellant], could you tell me—you've been diagnosed with depression or a depressive disorder and also bipolar—

**[Appellant]:** Yes.

**The Court:** --and you are taking medications.

**[Appellant]:** Yes.

**The Court:** What medications are you taking?

**[Appellant]:** Right now I'm taking Zoloft, 15 milligrams. And then I take—I take Remeron. I believe that's 25 milligrams at night with 2—150 milligrams of Trazodone. That's for the depression.

**The Court:** All right. And you were not taking these medications when you were on the street, is that fair to say?

**[Appellant]:** During the time of arrest I was off my meds. I hadn't taken my meds for several months before I got arrested.

**The Court:** All right. And how long have you been taking those medications—at what point in your incarceration did you start to take them?

**[Appellant]:** I believe it was like the end of January of '19. I had been in for about five, six weeks. It just takes a little while to get to the mental health people. Obviously [be]cause there's a lot of people ahead of me.

**The Court:** And he's been in custody since December 9th of '18, is that right, the day of the incidents?

- 8 -

**[Defense Counsel]:** That's correct, Your Honor.

**[Appellant]:** Yes.

*Id.* at 30-32.

The trial court asked Appellant if he wished to add any additional information to the record, and Appellant stated, "No. I just—you know, like I said, I already made my apologies to the officers. And that's, you know, like I said, that's not who I am. That's not what I stand for[.]" *Id.* at 42. Appellant again indicated he wished to apologize for his "crude and unacceptable" comments to the police officers. *Id.*

The trial court permitted the Commonwealth to make a recommendation as to sentencing, and the assistant district attorney ("ADA") indicated the following:

> **[ADA]:** Your Honor, the Commonwealth is asking that—or is asking that Your Honor sentence [Appellant] to a lengthy period of State incarceration, and we have several reasons for that request.
>
> First, when you look at [Appellant's] criminal history, what you see is 24 years of criminally destructive behavior. Criminally destructive behavior to the victim in this case and destructive behavior to the community.
>
> [Appellant] started his criminal career as a juvenile with multiple violent offenses. He was convict—adjudicated of robbery. He was convicted of burglary. He was convicted of simple assault.
>
> But what is even more telling in these offenses are the words that he said to the officers involved. If Your Honor looked at—and certainly—
>
> **The Court:** I did. He said—
>
> **[ADA]:** --review that—

**The Court:** He's accused of having said essentially the same thing he's accused of having said in this case. Things like "the only good cop is a dead cop" and things of that nature.

**[ADA]:** Yes.

**The Court:** Spitting on the police officers.

**[ADA]:** Yes.

**The Court:** Yes.

**[ADA]:** And going back as far as 2001. And the officer that was involved in this case was previously involved with [Appellant] back in 2001 when [Appellant] was convicted of, I believe it was, of a burglary at that point. His language and his words and his actions certainly show an individual who is a danger to the community. The repetitive nature of his conduct towards the officers, as Your Honor has stated. The multiple incidents of threatening the officers, spitting on them, not just to Officer Omlor but to Corporal Crosier and Officer Thomas in the 2016 incident.

The words that he said to the victim in this case. And, Your Honor, I understand that the victim alleges that she is not a victim in this case. But there is no way you cannot look at the summary of those police calls—or those prison calls and not see the way that this [Appellant] has repeatedly victimized her. The way he said repeatedly—

I believe his own words are—he told her to "shut the f**k up," and that she "has no f**king idea."

That she better hope they never let him out. If they do, he's going right back in.

She better hope they bury him under the jail and he would put his daughter's life on it.

And she better hope that she gets—he gets a hundred years in jail and dies.

He called her a "scumbag." He called her a "f**king canary and a piece of garbage."

And he repeatedly threatened her throughout this call and many other calls.

Your Honor, that is what is the true [Appellant] here. I would submit to you the apology that we heard today in this allocution was probably one of the least sincere apologies that—that is presented in a court of law. It clearly takes—does not take into consideration what these officers had to go through in having

- 10 -

to live during that time period not knowing whether or not they were or had AIDS.

I ask you to consider [Appellant's] words. I ask you to consider his conduct in this case. I ask you to consider all of the evidence in the [investigation report] that clearly shows that [Appellant] has engaged in a pattern of destructive and violent behavior which makes him a significant threat to the community. I ask you to consider all of that when you fashion a sentence [for Appellant].

*Id.* at 42-46.

The trial court permitted defense counsel to make a statement, and defense counsel relevantly indicated the following:

**[Defense Counsel]:** [Y]ou've heard Ms. McLaughlin testify that she doesn't feel like she's a victim. In fact, she has stated repeatedly—when she testified, you know, in this courtroom under oath, she said the officers weren't listening to her. She tried to explain what happened that night. And she does not believe that her testimony was anything inconsistent with what she tried to tell them that night.

So…a Domestic Violence Investigation, in this matter was probably inappropriate.

Now, [the ADA] raises the issue with regard to that prison call. And that prison call is horrific and difficult for me as a woman. It would be difficult for anyone to listen to.

But I listened to hundreds of telephone calls between these two people. And in many of those phone calls Ms. McLaughlin is complaining that he's cheating on her, cheating on her even at the jail. They are calling each other names. She called him at one point, that I noted, "a f'n idiot."

At another point she said that she found another boyfriend. He said, "You're crushing me."

She said, "Good."

So, there's many, many phone calls, Your Honor, where that's—what you heard from [the ADA] was to one phone call. There's many apologies. There's many—a lot of times spending the entire phone call talking about how much they love each other

- 11 -

and how they want to get their life back on track. So that phone call, I would argue, is not representative of the sum total of the conversations between these two people from the jail.

Your Honor, my client has been in custody for 18 months. He has availed himself of the programs. He is taking the medications that the correctional mental health has recommended for him. He's treated for depression and bipolar disorder. He says those medications help him, and he has been compliant and not all clients are you know. I think that is something significant.

He also has been taking classes at the jail. Another thing that he doesn't have to do. These classes are reintegration and, most significantly, anger management because he recognizes that he needs some help with that.

Your Honor also will remember that there were—there was a PFA that was originally filed by Ms. McLaughlin. There was also a PFA filed by him at the same time. So, this is clearly a relationship that needs some counseling. They both agree that they need that. But they're the people, Your Honor, that are at the very crux of this case, and they care about each other. They want to continue with the relationship, but they have wisely agreed they need to have some counseling.

Now part of the evidence that you heard was the terrible, terrible thing—completely disgusting things that my client said to the police officers that night. None of which really had anything to do with this case. They were not an element of any of the offenses and, thank goodness, the jury saw that. None of these— they found my client not guilty of all the specific intent crimes because they agreed that the actions that they saw on the videotape and his statement didn't support convictions on all of those counts.

And I think that [Appellant's] apology here today says that he recognizes how terrible those things were. But the jury, thank goodness, was able to kind of sort—sort through that.

And you also heard one of the officers state—when he observed the video in court, he said, "Jeez, it wasn't that violent." Well, it wasn't violent. [Appellant] wasn't trying to cause any— wasn't trying to assault any of those officers and that's what the jury determined thankfully.

Your Honor, my client has a family. He's spent 18 months in jail, part of it on lockdown because of the COVID crisis. He has availed himself of the various programs here.

He has a family business to return to. One of the things that [Appellant] and I discussed was his father. His father has cancer. Now Ms. McLaughlin brought it up, but [Appellant] told me he didn't want to use that he said. And I think that says something about his character.

But his father is ill and [Appellant] is his right-hand man and [Appellant] does have a place to go, does have a place to go back to.

\*\*\*

Your Honor, I am asking you to consider, his guidelines on the most serious count call for 21 to 30 months in the standard range. I would ask Your Honor to consider a time-served sentence. He has a family to go back to. He has a job to go back to. He has been in custody for a very, very long time.

Again, you heard the [investigation report] but I think those arguments, Your Honor, that really dealt that inapplicable in this case.

I would ask Your Honor for leniency. He was found not guilty of most of the –most of the serious crimes. The person who knows him best is Ms. McLaughlin and she wants him home. She cares about him. She wants to continue a relationship. You heard about the positive things that [the] woman who knows him best said about him and his character. And I would ask Your Honor to seriously consider what she says.

*Id.* at 50-56.

Prior to imposing sentence, the trial court relevantly indicated the following:

**The Court:** Now, I have, as I've said at the beginning, substantial familiarity with the case having presided over pretrial motions in the case, the jury selection that was complex, the actual two-day trial whereabouts. I heard a lot of testimony about what occurred; heard about a PFA [order] that had been entered. We heard the 911 call at least twice as I recall….

In any event, then we—you know, the content of the prison calls.

When I impose sentence, of course, I have certain obligations. One is, I have to look at the maximum sentences that

- 13 -

are permitted by law, and for criminal trespass the maximum sentence as a felony of the second degree includes the possibility of incarceration of up to 10 years. We have—and fines of up to $25,000.00.

We have sentencing guidelines in the case that grade that criminal trespass as an offense gravity score of 4 on a scale of 1 to 14 and with the Repeat Felony category for [Appellant]. The mitigated range is 18 months. The standard range is 21 to 30 months. The aggravated range is 33 months. So, I consider all of that.

I consider on the recklessly endangering another person count that he was convicted of, that actually involved one or two or three officers. And the standard range for a sentence on that is 12 months, which is essentially the statutory maximum. That's also an offense gravity score of 3 with an RFEL category for the prior record score. The mitigated range is 9 months. The aggravated range would be the statutory maximum.

As it relates to the criminal mischief counts, [defense counsel], I agree with you. There are two issues with regard to the criminal mischief counts.

I had some concern that the criminal mischief count—and just bear with me one second. I want to be precise.

Count 14, which was the property damage to Ms. McLaughlin's house. I had some concern that would merge for sentencing purposes into the criminal trespass because there was a great deal of testimony about [Appellant] having kicked in the rear garage door and then having tried to-–with a drill or something tried to gain entry from the garage into the primary residence. And to the extent that he did damage during that, which is also conceivably part and parcel of the criminal trespass, I had some concern that those sentences or those crimes might merge.

In addition, I agree—I mean, I don't mean to call attention to [the ADA's] small mistake—and I hate to call it that, [ADA]—but I do believe the Commonwealth had an obligation to present some evidence of the actual value or cost or damage, and there wasn't any presented with regard to the door. And there wasn't any presented on Count 15 as—I'm sorry, Count 13, which is the tires.

So, on Count 14 I treat it as a summary offense, and I believe there's an argument that it could merge, so I'm not going to impose any further penalty on Count 14.

As it relates to Count 13, I'll get to that in a second. But I will say that my view is, out of an abundance of caution, we're going to treat that as a summary offense.

\*\*\*

**[Defense Counsel]:** Thank you.

**The Court:** Now when I think about [Appellant,] and I think about his rehabilitative needs[,] and I think about the impact of his prior crimes [and] this crime on the community, I'm not just thinking about Ms. McLaughlin.

I do think of Ms. McLaughlin, and she's probably not going to like what I have to say. But I feel badly for Ms. McLaughlin in a way. And when you listen to that 911 call, there's no doubt in that 911 call—

\*\*\*

And so, when you listen to that tape [of the 911 call], you're hearing that [Appellant] is kicking in the back door and that he's using some kind of a mechanical drill object of some kind to get into the residence, and you hear the fear in Ms. McLaughlin's voice and she specifically describes it as [Appellant]. She spells his name on the 911 call.

And then she recanted at trial and said she wasn't sure who it was.

She didn't say that at all [during the 911 call]. She said, "It's [Appellant]." She says, "There's a PFA. He's not supposed to be here."

And then she allowed, through her recantation, the idea that there might have been some confusion about whether [Appellant] was permitted to be at the residence that night to retrieve his personal belongings. She allowed that to go forward.

And—and, look, I give great credit to the jury because using the reasonable doubt standard, which is a substantial, substantial standard, the jury gave [Appellant] the benefit of that reasonable doubt, and said, well, the PFA [order] does say something about he can come back and get his stuff. And, unfortunately, the PFA [order] was not as specific as they should be or it should have

- 15 -

been as to the exact time and circumstances under which he would have been allowed to come back and get his stuff.

And so the jury determined, I think rightfully, with the beyond a reasonable doubt standard that, well, there's a loophole there and we can't find beyond a reasonable doubt that he wasn't there with some permission, because Ms. McLaughlin allowed that inference to be drawn that he was there to get his stuff.

Of course, most guys going back to get their stuff don't have to kick the back door or use a drill to get in. Most guys just knock on the front door and say, "Hi, honey. I'm here to get my stuff." But, be that as it may.

And so, Ms. McLaughlin allowed that to occur. And I don't mean to be condescending or demeaning to Ms. McLaughlin and I promise I don't. I feel badly for her because she's caught up in the cycle of domestic violence like so many people we see.

***

In any event, when you read that and you read he's done that before. He has said—the actual words "the only good cop is a dead cop," he has said them before. Not just on this occasion. And so you start to get the sense that [Appellant] is a menace. Not just to Ms. McLaughlin, who from time to time sticks up for herself and other times retreats back.

And, ma'am, I mean it sincerely, I'm not casting judgment on you. I feel badly for you because you can't see what you're doing. You can't see that by doing what you attempted to do in the trial and doing what you attempted to do today that you're perpetuating this violence[.]

The prison calls—

[Defense counsel], I accept your professional representation that there are a lot of, let's say, warmer, more pleasant, more cordial phone calls; and that there are phone calls in which Ms. McLaughlin is the precipitator of the nastiness. I accept your representation. That does not surprise me at all. I'd be surprised if it were the other way.

The ones that were cited in the [investigation report] are just horrendous. Horrendous.

He was intimidating a witness. He could have been charged with that. I'm not suggesting he should have been. I'm saying he could have been.

- 16 -

He—

I want to cite the language.

"The defendant said, 'You put me'"—and I apologize for this language but so that it's on the record--- "'you put me the fuck in here you fucking cunt.'"

"The defendant said he was going to put her on blast about it and she has no clue what is going to happen. It is going to be all over social media, her name, phone number, and address."

"He wakes up every morning and is in jail because of her." Because of her.

She's "a piece of garbage…look at yourself in the mirror."

He's telling her not to show up at the preliminary hearing. He tells her don't show up. She hired a lawyer to try to avoid the subpoena or avoid the necessity of having to testify. That wasn't good enough for [Appellant]. "Just go out of town for the day." That's all she has to do. So what they issue a bench warrant, "big fucking deal."

"She better hope they never let him out. If they do, he's going right back in."

"She better hope they bury him under the jail. He said he was dead fucking serious; he put his daughter's life on it."

"She better hope he gets a hundred years and dies in jail."

He's saying this to the woman who's about to testify against him at a preliminary hearing. That—if you're charged with that offense, you might get 10 years in jail.

He asked her, "Did you write a statement? Did you write a statement? Did you write a statement?"

You have "to push the envelope with the case and the attorneys." Tell them that you were "coerced" when you said that.

He's telling her how to help his case. He doesn't care about her. He cares about the fact that his private counsel back then and [defense counsel], both able, highly experienced talented lawyers, told him "You're in a lot of trouble, [Appellant]. You might go to jail for 10 years."

\*\*\*

He's yelling at her, intimidating, scaring her. Essentially saying he's going to kill her if he gets out if she doesn't help him. That's what he's saying [in the prison phone calls]. Instead of

saying I'm really sorry. I don't know what causes this. I was off my meds. I feel horrible. I love you so much.

Now, maybe he did have conversations like that because the day after some of these nasty calls there's relatively nicer calls. But he really never owns it. It's all her fault. Just like his incarceration was all the fault of the police the night of the incident.

[Appellant], this is a serious case. Were it not for the talent of your attorney and the hard work that she put forth and the fact you had—well, you received an incredibly fair trial, I bent over backwards to see to it that you received a fair trial. I always do.

\*\*\*

And I'm aware that he has a substance abuse issue; and I'm aware that he has some mental health concerns; and I'm aware that he has not had a great life; and I'm aware that there are times in his life where, you know, he did okay for blocks of time; and I'm aware that Ms. McLaughlin cares about…him…in her own way.

\*\*\*

So, I factor all of these things into consideration and other things that, if I need to, I'll get more detailed about in a written opinion should it become necessary.

*Id.* at 57-72.

The trial court then sentenced Appellant to 3½ years to 10 years in prison for criminal trespass, and 6 months to 24 months in prison for recklessly endangering another person. The sentences were imposed consecutively, and Appellant was given credit for time served. The trial court imposed no further penalty for the two counts of criminal mischief.

On June 16, 2020, Appellant filed a timely, counseled motion to reconsider his sentence. On November 30, 2020, Appellant filed a *pro se* notice of appeal with the Pennsylvania Supreme Court, and on December 10,

2020, the trial court filed an order denying Appellant's post-sentence motion. Our Supreme Court transferred Appellant's *pro se* notice of appeal to the Bucks County Court of Common Pleas, which docketed the appeal on December 30, 2020.[3, 4]

In his counseled brief, Appellant presents the following issues in his "Statement of the Questions Involved" (verbatim):

> Did the trial court err in denying Appellant's request for reconsideration of sentence, and the court abused its discretion with which the state legislature has vested to it when it imposed a term of imprisonment of not less 4 years nor more than 12 years, which was clearly excessive, in that:
>
> > A)   The sentence for criminal trespass exceeded the aggravated range of the sentencing guidelines;
> >
> > B)   The trial court abused its discretion by imposing a consecutive sentence on the charge of recklessly endangering another person, which resulted in an aggregate 4 to 12 year sentence which was manifestly excessive under the circumstances;
> >
> > C)   The sentencing court failed to consider mitigating evidence that was presented by Appellant, including but not limited to his involvement in the

---

[3] Pursuant to Pa.R.A.P. 905(a)(4), Appellant's *pro se* notice of appeal is deemed to have been filed on November 30, 2020, when Appellant mistakenly filed the notice of appeal with our Supreme Court. As indicated *supra*, Appellant's post-sentence motion to reconsider sentence was still pending at this time; however, thereafter, the post-sentence motion was denied by the trial court. Pursuant to Pa.R.A.P. 905(a)(5), we consider Appellant's notice of appeal as having been filed after the entry of the order denying Appellant's post-sentence motion.

[4] On January 12, 2021, the trial court filed an order for a concise statement pursuant to Pa.R.A.P. 1925(b). The order contains a stamp indicating "N.B. it is your responsibility to notify all interested parties of the above action." Trial Court Pa.R.A.P. 1925(b) Order, filed 1/12/21. There is no docket entry or other indication that this order was properly served upon Appellant.

therapeutic programming at the Bucks County Correctional Facility, which included reintegration and anger management counseling, where Appellant's participation displayed he wanted to better himself;

D) Appellant was compliant with psychiatric therapy and medication while at the Bucks County Correctional Facility, he was not on his medication at the time of the incident, and the record clearly evidences the fact that at the time of the incident Appellant was not properly medicated for his mental health issues, proven by the indisputable evidence which showed that once incarcerated and properly medicated Appellant was a completely different person; and,

E) Appellant expressed remorse for his conduct.

Appellant's Brief at vi (suggested answer and unnecessary capitalization omitted).[5]

On appeal, Appellant claims the trial court's sentence for criminal trespass, which exceeded the aggravated range, is manifestly excessive and an abuse of the trial court's discretion. He also contends his aggregate sentence, resulting from the imposition of consecutive sentences, is manifestly excessive and an abuse of the trial court's discretion.

In this vein, Appellant contends that in imposing his sentence the trial court failed to consider the mitigating evidence, including Appellant's involvement in therapeutic programs, his psychiatric therapy, and his

---

[5] Although Appellant sets forth five separate sub-issues to his overarching sentencing claim, we note that Appellant has intertwined his sub-issues in a single argument section. Accordingly, we shall treat Appellant's sentencing issues in a similar manner.

medicine compliance while he was incarcerated awaiting trial and sentencing on the instant matter. Further, Appellant contends the trial court failed to consider his expression of remorse. He suggests the trial court did not impose a sentence consistent with the protection of the public, the gravity of the offense in relation to the impact on the victim and community, or the rehabilitative needs of Appellant.

When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. *See Commonwealth v. Moury*, 992 A.2d 162 (Pa.Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four[-]part analysis to determine: (1) whether [A]ppellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether [A]ppellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Moury*, 992 A.2d at 170 (citation omitted).

Here, assuming, *arguendo*, all of these requirements have been met, we conclude Appellant's sentencing issues are meritless.

> It is well-settled that:
>
> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its

judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Gonzalez***, 109 A.3d 711, 731 (Pa.Super. 2015)

(quotation omitted).

42 Pa.C.S.A. § 9721(b) offers the following guidance to the trial court's

sentencing determination:

> [T]he sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S.A. § 9721(b).

> Furthermore,
>
> Section 9781(c) specifically defines three instances in which the appellate courts should vacate a sentence and remand: (1) the sentencing court applied the guidelines erroneously; (2) the sentence falls within the guidelines, but is "clearly unreasonable" based on the circumstances of the case; and (3) the sentence falls outside of the guidelines and is "unreasonable."  42 Pa.C.S.A. § 9781(c).  Under 42 Pa.C.S.A. § 9781(d), the appellate courts must review the record and consider the nature and circumstances of the offense, the sentencing court's observations of the defendant, the findings that formed the basis of the sentence, and the sentencing guidelines.  The weighing of factors under 42 Pa.C.S.A. § 9721(b) is exclusively for the sentencing court, and an appellate court may not substitute its own weighing of those factors. The primary consideration, therefore, is whether the court imposed an individualized sentence, and whether the sentence was nonetheless unreasonable for sentences falling outside the guidelines, or clearly unreasonable for sentences falling within the guidelines, pursuant to 42 Pa.C.S.A. § 9781(c).

***Commonwealth v. Bricker***, 41 A.3d 872, 875-76 (Pa.Super. 2012) (citations

omitted).

When imposing sentence, a court is required to consider the

particular circumstances of the offense and the character of the defendant. In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation. Where pre-sentence reports exist, we shall…presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

***Commonwealth v. Antidormi***, 84 A.3d 736, 761 (Pa.Super. 2014) (quotation marks and quotation omitted).

Moreover, we note the "imposition of consecutive rather than concurrent sentences lies within the sound discretion of the sentencing court." ***Commonwealth v. Zirkle***, 107 A.3d 127, 133 (Pa.Super. 2013) (citation omitted). It is well-accepted "in imposing a sentence, the trial [court] may determine whether, given the facts of a particular case, a sentence should run consecutive to or concurrent with another sentence being imposed." ***Commonwealth v. Wright***, 832 A.2d 1104, 1107 (Pa.Super. 2003).

In the case *sub judice*, the record reveals the trial court imposed an individualized sentence consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and the community, and the rehabilitative needs of Appellant. 42 Pa.C.S.A. § 9721(b). Prior to imposing Appellant's sentence, the trial court stated on the record it was considering the factors set forth in Subsection 9721(b), as well as the sentencing guidelines.

Also, as indicated *supra*, the trial court heard Appellant's expression of remorse, as well as detailed evidence regarding Appellant's participation in

programs, his psychiatric therapy, and his medicine compliance while he was incarcerated awaiting trial and sentencing on the instant matter. Further, the trial court indicated it considered the investigation report provided to it by the Commonwealth. *See Antidormi*, *supra*.

Additionally, in its opinion, the trial court relevantly indicated the following:

> In determining the Sentence, the [trial] court considered the facts and circumstances surrounding the case, the gravity of the crimes, Appellant's age, his prior record, his rehabilitative needs, the risk he posed to the victim and the community, the impact of his crimes on the victim and the community, and Appellant's lack of acceptance of responsibility and remorse for his crimes.
>
> ***
>
> As to [the] Sentencing Guidelines, regarding Count 3, Appellant's prior record score was a 5 and his offense gravity score was a 4. Therefore, on Count 3, in the mitigated range the sentencing guidelines were 18 months, in the standard range the guidelines were 21 to 30 months and in the aggravated range the guidelines were 33 months. The [trial] court sentenced Appellant on Count 3 to 3.5 to 10 years' incarceration. While 3.5 years, or 42 months, exceeds the aggravated range of the guidelines, in this case, [is not unreasonable].
>
> On Count 7, given Appellant's prior record score of 5 and offense gravity score of 3, the sentencing guidelines in the mitigated range were 9 months and 12 months in the standard range, with no recommendation for the aggravated range. As such, the [trial] court's sentence of 6 to 24 months was within the standard range.

Trial Court Opinion, filed 3/3/21, at 13 (citation omitted).

We find no abuse of discretion in this regard. While Appellant requests this Court weigh the sentencing factors differently than the trial court, as indicated *supra*, "[t]he weighing of factors under 42 Pa.C.S.A. § 9721(b) is

exclusively for the sentencing court, and an appellate court may not substitute its own weighing of those factors." **Bricker**, 41 A.3d at 876. The trial court gave ample reasons for imposing a sentence exceeding the aggravated range for criminal trespass, as well as for imposing consecutive sentences.

Thus, Appellant's sentencing claims merit no relief.

For all of the foregoing reasons, we affirm.

Affirmed.

Judge Kunselman joins the memorandum.

Judge Nichols concurs in the result.

*Judgment Entered.*

_____
*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/15/2021*